UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORINIA

ALAN F.,[1]

                                        Plaintiff,

v.

KILOLO KIJAKAZI, Acting Commissioner of
Social Security,[2]

                                        Defendant.

Case No.:  22cv1771-MSB

**ORDER REVERSING COMMISSIONER'S
DECISION AND REMANDING FOR
FURTHER ADMINISTRATIVE
PROCEEDINGS [ECF NO. 14]**

On November 10, 2022, Plaintiff Alan F. ("Plaintiff") commenced this action

against Defendant Kilolo Kijakazi, Acting Commissioner of Social Security

("Commissioner"), for judicial review under 42 U.S.C. §§ 405(g) and 1383(c)(3) of a final

adverse decision for disability insurance benefits.  (ECF No. 1.)  Based on all parties'

consent (see ECF Nos. 3, 7), this case is before the undersigned as presiding judge for all

purposes, including entry of final judgment.  See 28 U.S.C. § 636(c).  Now pending

---

[1] Under Civil Local Rule 7.1(e)(6)(b), "[o]pinions by the Court in [Social Security cases under 42 U.S.C. §
405(g)] will refer to any non-government parties by using only their first name and last initial."
[2] On December 20, 2023, Martin O'Malley was sworn into office as Commissioner of the Social Security
Administration.  See https://www.ssa.gov/agency/commissioner/ (last visited on January 24, 2024).
Because Kilolo Kijakazi was the Acting Commissioner during the pendency of this lawsuit, the Court
uses her name.

1 | before the Court is Plaintiff's March 21, 2023, Motion for Summary Judgment.  (ECF No.
2 | 14 ("Mot.").)  On May 19, 2023, the Commissioner filed an Opposition.  (ECF No. 18
3 | ("Opp'n").)  Finally on June 2, 2023, Plaintiff filed a Reply.  (ECF No. 19 ("Reply").)  The
4 | Court has carefully reviewed the parties' pleadings [ECF Nos. 14, 18, 19], the
5 | Administrative Record ("AR") [ECF No. 10], and the Complaint [ECF No. 1].  For the
6 | reasons set forth below, the Court **ORDERS** that judgment be entered **REVERSING** the
7 | decision of the Commissioner and **REMANDING** the case for proceedings consistent
8 | with this Order.

## I.      PROCEDURAL BACKGROUND

On May 29, 2020, Plaintiff filed an application for supplemental security income benefits under Title XVI of the Social Security Act, alleging disability beginning on October 14, 2003—Plaintiff's date of birth.  (AR 223–32.)[3]  The Commissioner denied the application initially on September 9, 2020, and again upon reconsideration on February 2, 2021.  (AR 66–74, 76–86.)  On February 25, 2021, Plaintiff requested a hearing before an administrative law judge ("ALJ").  (AR 109–12.)  On September 14, 2021, ALJ Howard Treblin held a telephonic hearing, during which Plaintiff was represented by counsel. (AR 52–65.)  An impartial vocational expert ("VE"), Mary Jesko, and Plaintiff's mother, Maria Valtierra, also appeared and testified at the hearing.  (Id.)

In a written decision dated November 2, 2021 [AR 25–43], ALJ Treblin found that Plaintiff had not been under a disability: (1) prior to attaining age eighteen; (2) after attaining age eighteen; and (3) from May 29, 2020, the date the application was filed, through the date of his decision.  (AR 38, 43.)  On November 3, 2021, Plaintiff requested review of the ALJ's decision.  (AR 220–21.)  The Appeals Council denied Plaintiff's request on September 7, 2022, making the ALJ's decision the final decision of the Commissioner.  (AR 1–9.)  See also 42 U.S.C. § 405(g).  This timely civil action followed.

/ / /

---

[3] Where the pagination in the ECF banner of the cited document varies from the footer, the Court's pin cites refer to the ECF banner.

## II.   SUMMARY OF THE ALJ'S FINDINGS

The ALJ evaluated Plaintiff under both the childhood and adult disability standards due to Plaintiff turning eighteen during the alleged disability timeline.[4]  (See AR 25.)  First, using the three-step sequential evaluation process for children established under 20 C.F.R. § 416.924(a), the ALJ determined the following:

1. Plaintiff had not engaged in substantial gainful activity since May 29, 2020, the application date;

2. Prior to turning eighteen, Plaintiff had the following severe impairments: learning disorder and intellectual disability;

3. Prior to turning eighteen, Plaintiff did not have an impairment or combination of impairments that met or medically equaled, or functionally equaled, the severity of any listed impairments, including child listings 112.05 and 112.11 for intellectual disability and neurodevelopmental disorder, respectively.

(AR 30–38.)

Next, the ALJ followed the Commissioner's five-step sequential evaluation process for adults established under 20 C.F.R. § 416.920(a) and determined Plaintiff had not been disabled since attaining age eighteen.  (AR 38–43.)  The ALJ noted the severe impairments identified under the childhood standard—learning disorder and intellectual disability—continued since Plaintiff turned eighteen and that Plaintiff had not developed any new impairments since becoming an adult.  (AR 38.)  At step three, referencing his analysis conducted under child listings 112.05 and 112.11, the ALJ again found that Plaintiff's impairments did not meet or medically equal, or functionally equal, the severity of listings 12.05 and 12.11, the adult listings for intellectual disability and neurodevelopmental disorder, respectively.  (Id.)  The ALJ then determined Plaintiff had

---

[4] Plaintiff turned eighteen on October 13, 2021, after the application date but prior to the ALJ's written decision.  (AR 30, 42.)  Similar factors are considered for older adolescents and young adults aged eighteen to twenty-five.  See Titles II & XVI: Documenting & Evaluating Disability in Young Adults, SSR 11-2P (S.S.A. Sept. 12, 2011) ("[T]he evidence we consider when we make disability determinations for young adults is generally the same as, or similar to, the evidence we consider for making disability determinations for older adolescents under title XVI").

the residual function capacity ("RFC") to:

> perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to understand, remember, carry out, and apply simple repetitive tasks of 1-2 steps; can interact appropriately with coworkers and supervisors, but cannot do team or collaborative work; needs non-public work; can appropriately respond to supervision, routine work situations and settings and changes in routine work situations and settings; and appropriately ask questions and use judgment.

(AR 38–39.)

The ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms" are inconsistent with the medical evidence.  (AR 39–40.)  At step four, the ALJ found Plaintiff had no past relevant work experience.  (AR 42.)  Finally, at step five the ALJ found that given Plaintiff's age, education, work experience, and RFC, he could perform several jobs that exist in significant numbers in the national economy.  (Id.)  The VE testified that a hypothetical person fitting Plaintiff's profile could perform jobs such as garment folder (unskilled, light exertion, 57,000 jobs in the national economy), small parts assembler (unskilled, light exertion, 48,000 jobs in national economy), and seam presser (unskilled, light exertion, 28,000 jobs in the national economy).  (AR 42–43.) Therefore, the ALJ concluded that Plaintiff was not disabled since May 29, 2020, through the date of the decision.  (AR 43.)

### III.    DISPUTED ISSUES

Plaintiff raises five issues, which he asserts are grounds for reversal:

1. Whether the ALJ erred by failing to evaluate all medical opinions in the record;

2. Whether the ALJ erred by finding that Plaintiff did not meet or medically equal child listing 112.05 or adult listing 12.05 for intellectual disability;

3. Whether the ALJ properly evaluated Plaintiff under child listing 112.11 and adult listing 12.11 for neurodevelopmental disorders;

4.  Whether the ALJ erred by finding that Plaintiff did not functionally equal the severity of the listings;

5.  Whether the ALJ erred by crafting an RFC that is not supported by substantial evidence.

(Mot. at 12–26.)

## IV.     STANDARD OF REVIEW

Section 405(g) of the Social Security Act allows unsuccessful applicants to seek judicial review of the Commissioner's final decision.  See 42 U.S.C. § 405(g).  The scope of judicial review is limited, and the denial of benefits will only be disturbed if it is not supported by substantial evidence or contains a legal error.  Luther v. Berryhill, 891 F.3d 872, 875 (9th Cir. 2018) (internal citations omitted).  "Substantial evidence" is a "'term of art used throughout administrative law to describe how courts are to review agency factfinding.'"  Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting T-Mobile S., LLC v. City of Roswell, 135 S. Ct. 808, 815 (2015)).  The Supreme Court has said substantial evidence means "more than a mere scintilla," but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (quoting Consol. Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938)).  The Ninth Circuit explains that substantial evidence is "more than a mere scintilla but less than a preponderance."  Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017) (quoting Desrosiers v. Sec'y of Health & Hum. Servs., 846 F.2d 573, 576 (9th Cir. 1988).

Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be upheld.  See Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008) (citing Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)).  This includes deferring to the ALJ's credibility determinations and resolutions of evidentiary conflicts. See Lewis v. Apfel, 236 F.3d 503, 509 (9th Cir. 2001).  Even if the reviewing court finds that substantial evidence supports the ALJ's conclusions, the court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence and reaching his or her decision.  See Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d

1190, 1193 (9th Cir. 2004).  The reviewing court may enter a "judgment affirming, modifying, or reversing" the Commissioner's decision.  42 U.S.C. § 405(g).  The reviewing court may also remand the case to the Social Security Administration for further proceedings.  Id.  However, the reviewing court "may not reverse an ALJ's decision on account of an error that is harmless."  Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012).

## V.   DISCUSSION

### A. The ALJ Failed to Properly Consider All Medical Opinions

#### 1.  Summary of the parties' arguments

Plaintiff contends that the ALJ erred by not evaluating, or even citing, any of the findings of speech-language pathologist Bobbi Adams.  (Mot. at 25–26, Reply at 5–6.) The Commissioner argues that under the Social Security Administration's ("SSA") regulations, Ms. Adams' report did not constitute a medical opinion because it did not make "any statements about what Plaintiff can still do, nor does [it] describe any impairment related limitations or restrictions."  (Opp'n at 18.)  Instead, the Commissioner contends Ms. Adams' report constitutes objective medical evidence; thus, there was no medical opinion for the ALJ to evaluate.  (Id. at 18–19.)  Plaintiff also argues the ALJ erred by failing to address genetic testing performed by pediatric neurologist Michelle Sahagian, M.D., which indicated that Plaintiff's intellectual disability is genetic.  (Mot. at 15, 19, 22.)  In response, the Commissioner maintains the ALJ properly discounted Dr. Sahagian's opinion as "not persuasive because it was inconsistent with the record."  (Opp'n at 13.)

#### 2.  Applicable law

Plaintiff applied for disability insurance benefits on May 29, 2020.  (AR 223–32.) Because this is after March 27, 2017, the SSA's revised regulations for considering medical opinions and prior administrative medical findings ("PAMFs") apply.  See 20 C.F.R. § 404.1520c (2017).  Under the revised regulations, the ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any

medical opinion(s) or prior administrative finding(s)."  20 C.F.R. § 404.1520c(a).  Instead, the ALJ must evaluate the persuasiveness of all medical opinions and PAMFs and articulate his or her assessment as to each.  Id.  While the new regulations construe medical opinions and PAMFs as different types of evidence, 20 C.F.R. § 404.1520c makes clear that the persuasiveness analysis for both is identical.  Id. (referring to medical opinions and PAMFs collectively throughout the section).

In evaluating persuasiveness, the relevant factors are supportability, consistency, the relationship between the source and the claimant, the source's specialization, and other factors such as the source's knowledge of other evidence and whether there was subsequently submitted evidence.  20 C.F.R. §§ 404.1520c(c)(1)–(c)(5).  Though the ALJ may discuss each of these factors, the regulations only require the ALJ to explain how they considered the two most important factors—supportability and consistency.  20 C.F.R. § 404.1520c(b)(2).  "Supportability" measures the degree to which objective medical evidence and supporting explanations buttress a medical opinion.  20 C.F.R. §§ 404.1520c(c)(1); 416.920c(c)(1).  "Consistency" is the extent to which an opinion or finding is consistent with evidence from other medical sources and non-medical sources in the record.  20 C.F.R. §§ 404.1520c(c)(2); 416.920c(c)(2).  If two conflicting medical opinions are both equally well-supported and consistent with the record, the ALJ must explain how they considered the other persuasive factors.  20 C.F.R. § 404.1520c(b)(3).

The Ninth Circuit has held that "the decision to discredit any medical opinion[] must simply be supported by substantial evidence."  Woods v. Kijakazi, 32 F.4th 785, 787 (9th Cir. 2022).  See also Kitchen v. Kijakazi, 82 F.4th 732, 739 (9th Cir. 2023) (explaining how an ALJ weighing a medical opinion must provide an explanation supported by substantial evidence, which articulates how they considered supportability and consistency).  The ALJ can satisfy the substantial evidence requirement "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."  Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998) (citing Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).

Ultimately, "an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion."  Massey v. Kijakazi, No. 21-35986, 2022 WL 16916366, at *1 (9th Cir. Nov. 14, 2022) (quoting Garrison v. Colvin, 759 F.3d 995, 1012–13 (9th Cir. 2014)).

### 3.  Ms. Adams

#### a.  Ms. Adams' opinion and the ALJ's treatment thereof

In September 2015, speech pathologist Bobbi Adams, CF-SLP ("Ms. Adams") evaluated Plaintiff's eligibility for speech and/or language services based on teacher interviews, a review of records, and an informal Clinical Evaluation of Language Fundamentals ("CELF") assessment.  (AR 618–21.)  At the time of testing, Plaintiff was in sixth grade and enrolled in a general education classroom with specialized academic instruction ("SAI").  (AR 618.)  Ms. Adams "evaluated [Plaintiff] across multiple environments, including the speech/language room and SAI classroom."  (AR 619.) Under the language section, Ms. Adams noted that while "the CELF is normed, it is not normed for [Plaintiff's] cognitive level," and he "performed poorly across all subtests and did not show relative strengths in any particular section."  (AR 620.)  Plaintiff's cognitive measure was based on his "last measured cognitive score [of] 67."  (Id.)  The report further noted that Plaintiff "interacted appropriately with the teacher and interpreter, and his pragmatics were adequate for his developmental level."  (Id.)

Ms. Adams explained her results were consistent with information obtained during the interview with Plaintiff's SAI teacher:

> [Plaintiff] had poor language skills throughout all settings, but his language skills were commensurate with his cognitive abilities . . . he did not ask for help when he was confused.  Otherwise, his social skills seemed appropriate for his developmental level.  [Plaintiff] has several classroom friends.  [There are no] concerns with his articulation, voice, or fluency.

1    (Id.) Ms. Adams' added that this assessment was supported by Plaintiff's academic

2    record, as "scores have been consistent throughout his educational career" and he "has

3    not previously demonstrated any relative strength in speech or language." (Id.)

4    Ultimately, Ms. Adams found Plaintiff did not qualify for speech/language services

5    because his "speech and language skills fall within the expected range in comparison to

6    his cognitive level and [Plaintiff] does not demonstrate a disability." (AR 621.)  In his

7    written decision, the ALJ did not reference, or even cite, any of the findings of Ms.

8    Adams' speech and language evaluation.  (See AR 25–43.)

9                                    **b. Analysis**

10          Medical sources for determining disability in children and adults include speech-

11   language pathologists.  See 20 C.F.R. § 416.924a(a); 20 C.F.R. § 416.902(a)(5).  The

12   Commissioner appears to agree that Ms. Adams is a medical source.  (See Opp'n at 18–

13   19.)  However, the Commissioner contends that Ms. Adams' findings do not constitute a

14   medical opinion under the SSA regulations, but instead constitute "objective medical

15   evidence or 'other medical evidence.'"  (Opp'n at 18.)  We disagree.

16          "A medical opinion is a statement from a medical source about what you can still

17   do despite your impairment(s) and whether you have one or more impairment-related

18   limitations or restrictions."  20 C.F.R § 416.913(a)(2).  In child claims, medical opinions

19   focus on the six functional domains.  20 C.F.R. § 416.913(a)(2)(ii).  Two of the functional

20   domains expressly address how language relates to overall functioning.  First, in the

21   domain of acquiring and using information, children aged six to twelve "should be able

22   to use increasingly complex language (vocabulary and grammar) to share information

23   and ideas with individuals or groups, by asking questions and expressing your own ideas,

24   and by understanding and responding to the opinions of others." 20 C.F.R.

25   § 416.926a(g)(2)(iv).  Second, in the domain of interacting and relating with others,

26   children aged six to twelve "should be well able to talk to people of all ages, to share

27   ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners

28   readily understand."  20 C.F.R. § 416.926a(i)(2)(iv).

1    Ms. Adams' report constitutes a medical opinion because it discusses what

2    Plaintiff can and cannot do despite his limitations and how those limitations relate to

3    several functional domains.  See Joseph L.S. v. Kijakazi, No. 5:23-CV-00006-BFM, 2023

4    WL 5611408, at *2 (C.D. Cal. Aug. 30, 2023) (finding that a doctor's commentary on

5    plaintiff's inability to sustain concentration or repetitive tasks, inability to adapt to new

6    situations, attitude during testing, and intact memory qualified as a medical opinion that

7    identified impairment-related limitations); T.T. v. Comm'r of Soc. Sec., No. 2:19-CV-

8    01608-JDP (SS), 2021 WL 307561, at *5 (E.D. Cal. Jan. 29, 2021) (noting a consultative

9    speech and language examiner's findings, which compared the plaintiff to unimpaired,

10   same-aged children, should have been treated as medical opinion evidence).  But see

11   Nancy May J. v. Kijakazi, No. 2:20-CV-00486-CWD, 2022 WL 684372, at *5 (D. Idaho Mar.

12   8, 2022) (finding a doctor's statements regarding "diagnoses and the symptoms

13   generally associated with the diagnoses are objective medical evidence" and not a

14   medical opinion assignable to specific functional limitations).

15        As noted above, Ms. Adams' report referenced Plaintiff's poor performance in the

16   CELF across all subtests.  (AR 620.)  By pointing out that the test is "normed" but not to

17   someone of Plaintiff's cognitive level, Ms. Adams implied Plaintiff is performing poorly

18   relative to same-aged peers with average cognitive ability.  (Id.)  Further, Ms. Adams

19   concluded Plaintiff's language difficulties are due to his cognitive and developmental

20   levels and not a specific speech or language-related impairment.  (AR 621.)  In summary,

21   Ms. Adams provided her professional opinion that Plaintiff's poor language skills are

22   consistent with an individual with an IQ of 67.  Because language is a factor in two

23   functional domains (acquiring and using information and interacting and relating to

24   others), we find Ms. Adams' statements about Plaintiff's language limitations are

25   relevant to his abilities in the six functional domains and constitute a medical opinion.

26   See Joseph L.S., 2023 WL 5611408, at *2.  Accordingly, the ALJ was required to address

27   the persuasiveness of Ms. Adams' opinion.  See 20 C.F.R. § 404.1520c(a).

28   ///

### 4. Dr. Sahagian

#### a. Dr. Sahagian's opinion and the ALJ's treatment thereof

Pediatric neurologist Michelle Sahagian, M.D. ("Dr. Sahagian") first met with Plaintiff in November 2020, noting the frequency of treatment to be every six months. (AR 1187.)  Presumably, based on this initial visit, genetic testing was ordered in December 2020 that showed "[a]n approximately 4.6 Mb loss (deletion) of 7q33q34." (AR 1184.)  This deletion involves several genes, the loss of which are characterized by "cardiac defects, intellectual disability and facial dysmorphism," and potentially other more severe presentations.  (Id.)  In March 2021, Dr. Sahagian submitted a check-the-box medical opinion diagnosing Plaintiff with "intellectual disability secondary to a deletion of chromosome 7."  (AR 1187.)  She listed Plaintiff's diagnosis as "good – condition not life threatening, but he will be dependent on care for his lifetime."  (Id.) Dr. Sahagian found Plaintiff had marked[5] limitations in the following functional areas:

1.  understanding, remembering, or applying information;

2.  interacting with others;

3.  concentrating, persisting, or maintaining pace; and

4.  adapting or managing oneself.

(AR 1187–88.)  Dr. Sahagian further indicated Plaintiff had marked limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, caring for oneself; moderate[6] limitations in moving about and manipulating objects; and extreme[7] limitations in health and physical well-being.  (AR 1188–90.)  At the end of the report, Dr. Sahagian again noted that Plaintiff's "intellectual

---

[5] "Marked" means functioning independently, appropriately, effectively, and on a sustained basis is seriously limited.  20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.00(F)(2)(d).

[6] "Moderate" means functioning in this area independently, appropriately, effectively, and on a sustained basis is fair.  20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.00(F)(2)(c)

[7] "Extreme" means unable to function independently, appropriately, effectively, and on a sustained basis.  20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.00(F)(2)(e).

1   disability is a life long noncurable condition.  He will be dependent on care for life."  (AR

2   1190.)

3        In his written decision, the ALJ found Dr. Sahagian's opinion "not persuasive," but

4   he made no explicit findings regarding supportability or consistency.  Instead, he

5   provided the following threadbare assessment:

> This opinion is not persuasive because it is inconsistent with the objective
> medical record.  For instance, the claimant reports having at least two
> friends [AR 1087] and was completing his work on Google Classroom and
> attending class via online video [AR 856].  This is inconsistent with marked
> limitations in attending and completing tasks and interacting and relating to
> others.

10  (AR 41.)

11                          **b.  Analysis**

12       Because the ALJ rejected Dr. Sahagian's opinion as unpersuasive, he was required,

13  at minimum, to explain how he considered the supportability and consistency factors.

14  See 20 C.F.R. § 404.1520c(b)(2).  The ALJ failed to do so.  First, the ALJ did not reference

15  "supportability" at all in his assessment of Dr. Sahagian's opinion.  (AR 41.)  The Court

16  cannot "speculate as to the grounds for the ALJ's conclusion."  Brown-Hunter v. Colvin,

17  806 F.3d 487, 495 (9th Cir. 2015); Juan E. v. Kijakazi, No. 22-CV-0049-AGS-BGS, 2023 WL

18  5726463, at *10 (S.D. Cal. Aug. 18, 2023), report and recommendation adopted, No. 22-

19  CV-0049-AGS-BGS, 2023 WL 5734906 (S.D. Cal. Sept. 5, 2023) (holding the ALJ's

20  supportability analysis was insufficient where it contained only a "vague reference" to

21  the medical summary and required the court to "speculate as to the grounds of his

22  conclusion").  Further, there is objective medical evidence in the record that may have

23  supported Dr. Sahagian's findings regarding Plaintiff's functional abilities—including

24  Plaintiff's genetic testing results, academic achievement test results, and speech-

25  language evaluation—all of which were not discussed by the ALJ.  (See generally AR

26  1184–86, 1196.)

27       Second, the ALJ failed to adequately address the consistency of Dr. Sahagian's

28  opinion.  The ALJ concluded Dr. Sahagian's assessment of marked limitations in two

1  functional areas was "inconsistent" with the objective medical record.  (AR 41.)  An ALJ

2  is not permitted to reject a medical opinion as inconsistent "without providing an

3  explanation supported by substantial evidence."  Juan E., 2023 WL 5726463, at *10

4  (citing Woods, 32 F.4th at 792).  Here, although the ALJ cited two records showing

5  Plaintiff had at least two friends [AR 1087] and attended virtual school [AR 856], this

6  does not constitute an explanation supported by substantial evidence.  Id.  As with the

7  supportability factor, by failing to meaningfully address conflicting evidence supporting

8  Plaintiff's limitations, the Court is left to speculate as to how the ALJ reached his

9  conclusions.  Brown-Hunter, 806 F.3d at 495.  Additionally, district courts in the Ninth

10  Circuit and elsewhere "have remanded where evidence supporting or consistent with a

11  rejected medical opinion was ignored."  Thompson v. Comm'r of Soc. Sec., No. 2:20-CV-

12  3-KJN, 2021 WL 1907488, at *6 (E.D. Cal. May 12, 2021) (collecting cases).  Thus, the

13  Court finds the ALJ erred by failing to adequately discuss the mandatory supportability

14  and consistency factors.  See 20 C.F.R. § 404.1520c(b)(2).

15    **5.  Conclusion**

16    The ALJ failed to properly evaluate all medical opinions pursuant to the SSA

17  regulations.  First, the ALJ erred by omitting Ms. Adams' report without addressing the

18  persuasiveness of it.  See Garrison, 759 F.3d at 1012–13 ("[A]n ALJ errs when he rejects

19  a medical opinion or assigns it little weight while doing nothing more than ignoring it . . .

20  .")  Additionally, when assessing Dr. Sahagian's medical opinion, the ALJ erred by failing

21  to adequately discuss the mandatory supportability and consistency factors.  See 20

22  C.F.R. § 404.1520c(b)(2).  On remand, the ALJ is directed to re-evaluate Ms. Adams' and

23  Dr. Sahagian's opinions using the appropriate and required factors.

24    **B.  The ALJ Erred by Finding Plaintiff Did Not Meet or Medically Equal the**

25      **Paragraph (B)(1) Criteria for Child and Adult Intellectual Disorders**

26    **1.  Summary of the parties' arguments**

27    Plaintiff contends the ALJ erred by concluding Plaintiff did not meet the Paragraph

28  (B)(1) criteria for child and adult intellectual disorders, listings 112.05 and 12.05

1  respectively.  (Mot. at 14–16.)  Plaintiff primarily alleges the ALJ improperly "cherry-

2  picked" certain intelligence quotient ("IQ") testing, while ignoring other IQ scores.

3  (Mot. at 14–16.)  In response, the Commissioner argues that because Plaintiff scored 82

4  on two IQ tests, including one in August 2018, the ALJ reasonably concluded that

5  Plaintiff did not consistently have a full scale IQ below 70.  (Opp'n at 12.)  Accordingly,

6  the Commissioner maintains the ALJ properly evaluated the Paragraph (B)(1) criteria for

7  these listings.  (Id.)

8    **2. Applicable law**

9    To satisfy the Paragraph (B)(1) criteria for listings 112.05 or 12.05, the claimant

10  must establish a "full scale (or comparable) IQ score of 70 or below on an individually

11  administered standardized test of general intelligence."[8]  See 20 C.F.R. Pt. 404, Subpt. P,

12  App. 1, §§ 12.05(B)(1)(a), 112.05(B)(1)(a).  The SSA finds IQ test results usable when they

13  meet program requirements and are administered by a qualified specialist.  See 20

14  C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(H)(2)(a).  The Program Operations Manual

15  System ("POMS") is instructive to determine program requirements.  See Using

16  Intelligence Tests to Evaluate Cognitive Disorders, Including Intellectual Disorder, SSA

17  POMS DI 24583.055.  "Although POMS is not binding law, [POMS] is persuasive

18  authority."  Buck v. Berryhill, 869 F.3d 1040, 1050–51 (9th Cir. 2017) (citing Warre v.

19  Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1005 (9th Cir. 2006)); see also Carillo-Yeras

20  v. Astrue, 671 F.3d 731, 735 (9th Cir. 2011) (noting POMS may be entitled to respect "to

21  the extent it provides a persuasive interpretation of an ambiguous regulation").

22    According to the POMS, "IQ scores must be current to be used to meet or

23  medically equal the IQ requirements of listings 12.05 and 112.05.  Scores stabilize after

24  age sixteen and are generally considered current after that time."  DI 24583.055(I)(7).

25

26

27  [8] Alternatively, the claimant can show "[a] full scale (or comparable) IQ score of 71–75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence."  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§

28  12.05(B)(1)(b), 112.05(B)(1)(b).

For children under age seven with an IQ over 40, scores are considered current for one year; for children aged seven to sixteen with an IQ over 40, scores are considered current for two years.  Id.  Tests for children aged sixteen or older may be considered current indefinitely, provided they are "not inconsistent with the person's current functioning."  Id.  Additionally, nonverbal intelligence tests[9] and academic achievement tests cannot be used to meet the full scale IQ requirement under listings 112.05 or 12.05.  See DI 24583.055(I)(3);  DI 24583.050(D)(3).  However, nonverbal tests may be used to medically equal the IQ requirements under Paragraph (B)(1) when "the person is unable to undergo standard administration of a traditional intelligence test."  DI 24583.055(I)(3).  Lastly, when the record contains multiple intelligence tests, the POMS states an adjudicator should use the results from the most recent test if it was programmatically acceptable.  DI 24583.055(I)(8).

### 3.  Analysis

Because evaluation of impairments under the adult standard is like that of older adolescents and young adults, the analysis below is applicable to Plaintiff's disability determination under both the child and adult standards.  See Titles II & XVI: Documenting & Evaluating Disability in Young Adults, SSR 11-2P (S.S.A. Sept. 12, 2011) ("[T]he evidence we consider when we make disability determinations for young adults is generally the same as, or similar to, the evidence we consider for making disability determinations for older adolescents under title XVI").  The ALJ held Plaintiff failed to meet the Paragraph (B)(1) criteria for child and adult intellectual disorders because Plaintiff "does not consistently have a full scale [sic] IQ score of 70 or below."  (AR 32 (citing AR 448).)  To support his finding, the ALJ cited a single test from March 7, 2008, where Plaintiff "had a [f]ull [s]cale score of 82."  (AR 32 (citing AR 448).)  The ALJ's only other mention of an IQ score occurs several pages later in his discussion of Plaintiff's

---

[9] "Although many nonverbal tests measure multiple areas of intelligence, they do not include language and thus are not comprehensive tests of general intelligence."  POMS DI 24583.055(I)(3)

1  RFC, as he notes Plaintiff "was assessed [a] full scale IQ score of 70 on October 19,

2  2009."  (AR 40 (citing AR 706).)

3         Plaintiff argues the ALJ erred by failing to consider three test scores where

4  Plaintiff scored a 70 or below: (1) a nonverbal index of 64 on the Kaufman Assessment

5  Battery for Children in October 2009 [AR 706]; (2) a full-scale score of 70 on the

6  Wechsler Nonverbal Scale of Ability in October 2009 [AR 706]; and a perceptual

7  reasoning index[10] of 67 on the Wechsler Intelligence Scales for Children– Fourth Edition

8  in August 2012 [AR 707–08].  (Mot. at 15–16.)  We agree.  Not only did the ALJ fail to

9  mention these tests in his written decision, but he relied on a single outdated

10  intelligence test from March 7, 2008, to support his conclusion that Plaintiff did not

11  meet the Paragraph (B)(1) criteria.  Plaintiff was four years old at the time of the March

12  2008 testing.  (See AR 223, 448.)  According to the POMS, because Plaintiff had not yet

13  attained the age of seven at the time of this testing, the score would only be considered

14  current for one year, or until March 7, 2009.  See DI 24583.055(I)(7).  Similarly, the

15  October 2009 IQ score cited in the ALJ's RFC discussion would only be considered

16  current for one year, or until October 19, 2010.  Id.

17         Here, the ALJ held an administrative hearing on September 14, 2021 [AR 52–65]

18  and issued his written decision on November 2, 2021 [AR 25–43].  Thus, the March 2008

19  and October 2009 IQ scores became non-current more than ten years before the

20  adjudication date and were not valid indicators for determining whether Plaintiff met

21  the Paragraph (B)(1) criteria.  See DI 24583.055(I)(7); Medina v. Comm'r of Soc. Sec., No.

22  1:21-cv-1441-AWI-SAB, 2022 WL 3226141, at *12 (E.D. Cal. Aug. 10, 2022), report and

23  recommendation adopted sub nom. Medina on behalf of Minor I.I.M v. Comm'r of Soc.

24  Sec., No. 1:21-cv-1441-AWI-SAB, 2022 WL 4238884 (E.D. Cal. Sept. 14, 2022) (finding

25  that claimant's "February 2016 test became non-current as of February 2018, well

26

27  _____

   [10] The POMS explains "[a] comparable score is an IQ score that reflects the same type and scope of a
28  person's intelligence, even though a different name for the score may be used."  DI 24583.055(E)(3).  A
   perceptual reasoning index is considered a comparable score.  Id.

1  before the January 31, 2019 application date, as well as the November 4, 2020 hearing

2  and the ALJ's January 28, 2021 decision," and was therefore invalid for determining

3  whether Plaintiff's intellectual disorder met listing 112.05).  Because the ALJ's written

4  decision cites only outdated, invalid IQ scores, the Court finds error.

5      The Commissioner argues Plaintiff's IQ score of 82 from August 2018 supports the

6  ALJ's determination that Plaintiff failed to satisfy the Paragraph (B)(1) criteria.  (Opp'n at

7  12 (citing AR 767).)  The ALJ did not cite this test when assessing Plaintiff's intellectual

8  functioning, so the Court cannot say whether he considered it.  (See generally AR 30–

9  38.)  Additionally, Plaintiff was under the age of sixteen at the time of this testing so it

10  would only be considered current for two years— until August 24, 2020.  (AR 767.)  See

11  also DI 24583.055(I)(7).  Once again, this test would not be a valid indicator as of the

12  September 14, 2021 administrative hearing [AR 52–65] and November 2, 2021 written

13  decision [AR 25–43].  Moreover, the August 2018 test is a Test of Nonverbal Intelligence

14  – Fourth Edition, which ordinarily cannot be used to meet the requirements for listings

15  112.05 and 12.05.  (AR 767.)  See also DI 24583.055(I)(3) ("Many nonverbal intelligence

16  tests will not satisfy the requirements for standardized tests of general intelligence

17  found in section 12.00H of the mental disorders listings").  Nonverbal tests may be used

18  for medical equivalence in limited situations, such as when English is not the test taker's

19  primary language, or a test taker has severe language impairments.  Id.  Because the ALJ

20  did not refer to the August 2018 test at all, he also did not articulate a rationale for

21  relying on a nonverbal test to assess intellectual functioning.  (See generally AR 30–38.)

22  Thus, the Court does not find Defendant's argument persuasive.

23      **4.  Conclusion**

24      The record reflects that the ALJ overlooked at least three tests where Plaintiff had

25  an IQ score of 70 or below.  (See AR 706–08.)  Further, the ALJ erred by relying on a

26  single, outdated intelligence test from March 7, 2008 to support his determination that

27  Plaintiff failed to meet the Paragraph (B)(1) criteria for listings 112.05 and 12.05.  (AR

28

32.)  The only other IQ test referred to in the ALJ's decision was a full scale IQ score of 70 on October 19, 2009.  (AR 40.)  Both the March 2008 and October 2009 scores—which occurred when Plaintiff was merely four years old and six years old—were far beyond the time to be considered valid indicators of IQ.  See DI 24583.055(I)(7) (explaining childhood IQ scores greater than 40 remain "current" for one to two years, depending on the individual's age at the time of testing).  Thus, the ALJ's reliance on an outdated, childhood IQ score to determine intellectual disability was a legal error.

Indeed, in cases where IQ scores "are relied upon for the purpose of assessing [an intellectual] disability, there is no question that a fully and fairly developed record . . . will include a complete set of IQ scores that report verbal, non-verbal, and full-scale abilities."  Garcia v. Comm'r of Soc. Sec., 768 F.3d 925, 930–31 (9th Cir. 2014) (internal citations and quotations omitted) (finding the ALJ had a duty to develop the record to include a complete set of IQ results and "her failure to do so was legal error."); see also Medina, 2022 WL 3226141, at *11 (concluding the invalid IQ tests in the record triggered a duty to develop the record, and "failure to order further IQ testing or otherwise further develop the record as to Plaintiff's IQ scores" was reversible error); Conner v. Comm'r of Soc. Sec. Admin., No. CV-17-00340-TUC-BPV, 2018 WL 4140839, at *12 (D. Ariz. Aug. 30, 2018) (finding the ALJ legally erred when relying on outdated IQ tests to find Plaintiff did not meet listing 12.05 IQ criteria).  Here, there is a genuine possibility that, had a complete set of valid IQ test scores been included in the record, the results might have been different.  On remand, the ALJ is instructed to re-evaluate the entirety of the evidence and fully develop the record regarding Plaintiff's IQ testing.

**C.**  **The ALJ Erred by Finding Plaintiff Did Not Meet or Medically Equal the Paragraph (B)(2) Criteria for Child and Adult Intellectual Disorders**

**1.  Summary of the parties' arguments**

Plaintiff next asserts the ALJ failed to consider the whole record and mischaracterized evidence when concluding Plaintiff did not meet the Paragraph (B)(2) criteria for child and adult intellectual disorders, listings 112.05 and 12.05 respectively.

(Mot. at 16–22.)  Specifically, Plaintiff argues the ALJ wrongly determined Plaintiff's impairments did not qualify as at least "marked" limitations in three areas of mental functioning: (1) understanding, remembering, or applying information; (2) interacting with others; and (3) adapting or managing oneself.  (Mot. at 16–22.)  Plaintiff does not appear to contest the ALJ's determination in the functional area of concentrating, persisting, or maintaining pace, and does not dispute the Commissioner's assertion that he waived arguments disputing this functional area.  (Id.; Opp'n at 12–13 n. 2.)  Accordingly, the Court will address the three functional areas identified by Plaintiff.

### 2. Applicable law

For a claimant to meet the Paragraph (B)(2) criteria, they must demonstrate "[s]ignificant deficits in adaptive functioning currently manifested by" marked limitations in two areas of mental functioning or an extreme limitation in one area of mental functioning.  20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.05(B)(2), 112.05(B)(2).  The four areas of mental functioning are:

1.  Understand, remember, or apply information;

2.  Interact with others;

3.  Concentrate, persist, or maintain pace; and

4.  Adapt or manage oneself.

Id.  A marked limitation for children is present when the:

impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities.  Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities . . . It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

20 C.F.R. § 416.926a(e)(ii)(2).  For adults, it means the claimant's functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2)(d).  An extreme limitation for children "interferes very seriously with your ability to independently initiate, sustain, or

1  complete activities."  20 C.F.R. § 416.926a(e)(ii)(3).  Extreme limitations are more than

2  marked, however, "'extreme limitation' does not necessarily mean a total lack or loss of

3  ability to function.  It is the equivalent of the functioning we would expect to find on

4  standardized testing with scores that are at least three standard deviations below the

5  mean."  Id.  For adults, it means the claimant is not able to function in this area

6  independently, appropriately, effectively, and on a sustained basis.  See 20 C.F.R. Pt.

7  404, Subpt. P, App. 1, § 12.00(F)(2)(e).

8       The SSA provides additional guidance on evaluating limitations in functional areas

9  B1, B3, and B4 under both the adult and child listings.  20 C.F.R. Pt. 404, Subpt. P, App. 1

10  §§ 12.05(F)(3)(f), 112.05(F)(3)(e).  In these areas, "the greatest degree of limitation of

11  any part of the area of mental functioning directs the rating of limitation of that whole

12  area of mental functioning."  Id.  "For example, with respect to paragraph B3, if you

13  have marked limitation in concentrating, but your limitations in persisting and

14  maintaining pace do not rise to a marked level, we will find that you have marked

15  limitation in the whole . . . area of mental functioning."  20 C.F.R. Pt. 404, Subpt. P, App.

16  1 §§ 12.05(F)(3)(f)(ii), 112.05(F)(3)(e)(ii).  Social Security Ruling 09-1p states "the rating

17  of limitation of a domain is not an 'average' of what activities the child can and cannot

18  do." [11]  Title XVI: Determining Childhood Disability Under the Functional Equivalence

19  Rule-the "Whole Child" Approach, SSR 09-1P at III(B) (S.S.A. Feb. 17, 2009).

20       In determining disability for children, the SSA considers medical evidence and

21  statements from nonmedical sources such as parents, teachers, and others who have

22  insight into day-to-day functioning.  20 C.F.R. § 416.924a(a)(1)–(2).  Factors considered

23  when evaluating functioning include, among others, "how [a child's] functioning

24  compares to the functioning of children [their] age who do not have impairments";

25

26

27  [11] Social Security Ruling 09-1p continues, "[t]he fact that a child can do a particular activity or set of activities relatively well does not negate the difficulties the child has in doing other

28  activities."  Title XVI: Determining Childhood Disability Under the Functional Equivalence Rule-the "Whole Child" Approach, SSR 09-1P at III(B) (S.S.A. Feb. 17, 2009).

"how well [a child] can initiate, sustain, and complete [their] activities, including the amount of help or adaptations [needed], and the effects of structured or supportive settings"; and special education programs.  20 C.F.R. § 416.924a(b)(1)–(9).  Importantly, the ALJ is required to examine evidence in the broader context of a claimant's impairment.  Attmore v. Colvin, 827 F.3d 872, 877 (9th Cir. 2016) (finding the ALJ's findings were not supported by substantial evidence because the isolated improvements the ALJ relied upon were not representative of the continuing severity of the claimant's symptoms); see also Diedrich v. Berryhill, 874 F.3d 634, 642 (9th Cir. 2017) (finding the ALJ's improper cherry-picking of evidence was insufficient to show "broader development" of plaintiff's lack of symptoms).

**3.  Analysis**

Because evaluation of impairments under the adult standard is like that of older adolescents and young adults, the analysis below is applicable to Plaintiff's disability determination under both the child and adult standards.  See SSR 11-2P.

### a.  Understanding, remembering, or applying information

Functional area B1—understanding, remembering, or applying information— "refers to the abilities to learn, recall, and use information to perform" age-appropriate (child standard) or work-related (adult standard) activities.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.00(E)(1), 112.00(E)(1).[12] [13]  The ALJ found Plaintiff has a moderate limitation in this area:

> The claimant reports he has limitations in understanding and using what he has learned.  [AR 260].  He does not read and understand sentences in comics, cartoons, books, magazines, and newspapers; spell words of more than four letters; tell time; multiply and divide numbers; add or subtract numbers over 10; understand money or make change; or understand, carry

---

[12] Examples under the child standard include: "Understanding and learning terms, instructions, procedures; following one- or two-step oral instructions to carry out a task; describing an activity to someone else."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.00(E)(1).

[13] Examples under the adult standard include: "Understanding and learning terms, instructions, procedures; following one- or two-step oral instructions to carry out a task; describing work activity to someone else." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E)(1).

out, and remember simple instructions [AR 260].  However, the claimant
has a 3.39 GPA and is ranked 133 out of 507 students in his graduating class
[AR 848].  This is inconsistent with more severe limitations in
understanding, remembering, or applying information.

(AR 30–31.)

Plaintiff primarily argues the ALJ's reliance on Plaintiff's GPA to refute his severe

limitations in this area was an oversimplification and mischaracterization of the

academic record.  (Mot. at 17–20.)  We agree.  As noted above, factors considered when

evaluating functioning include how a child functions compared to same-aged peers

without impairments, the effects of structured or supportive settings, and special

education programs.  20 C.F.R. §§ 416.924a(b)(1)–(9).  According to Plaintiff's latest

Individualized Education Program dated March 16, 2021 ("2021 IEP"), when Plaintiff was

a senior in high school, he was in special education for seventy percent of the school day

"because [Plaintiff] requires specialized small group instruction in functional

skills/academic areas."  (AR 343.)  Additionally, the 2021 IEP indicates Plaintiff was

reading at a third-grade level with only forty percent comprehension and Plaintiff

required "several prompts" to compose a sentence because of his inability to recall

information.  (AR 1196, 1201.)  Further, Plaintiff was enrolled in "functional" coursework

designed for those on track for a certificate of completion, as opposed to the traditional

high school degree.  (AR 848, 1194).

The ALJ acknowledged that Plaintiff does not "read and understand sentences in

comics, cartoons, books, magazines, and newspapers; spell words of more than four

letters; tell time; multiply and divide numbers; add or subtract numbers over 10;

understand money or make change; or understand, carry out, and remember simple

instructions."  (AR 30.)  However, the ALJ discounted these limitations by simply

pointing to Plaintiff's GPA and class rank.  (AR 30–31.)  The ALJ's omission of key

information—such as the extent of Plaintiff's enrollment in special education classes

and the type of support he requires during the school day—is a mischaracterization of

Plaintiff's academic record.  See Reddick, 157 F.3d at 723 (finding the ALJ erred when he

"developed his evidentiary basis by not fully accounting for the context of materials or all parts of the testimony and reports."); <u>Jones v. Kijakazi</u>, No. 21-16950, 2022 WL 4285597, at *1 (9th Cir. Sept. 16, 2022) (finding the ALJ's omission of important qualifying information was a mischaracterization of the evidence); <u>Normalya T. v. Kijakazi</u>, No. 22-CV-02691-JST, 2023 WL 4109574, at *6 (N.D. Cal. June 20, 2023) (finding the ALJ erred when she "mischaracterized the evidence on which she relied and otherwise selectively cited the record to portray Plaintiff's conditions as less severe than the record actually shows them to be").

Plaintiff also correctly points out that the ALJ failed to account for three scores on the Woodcock Johnson Test of Achievement – Fourth Edition ("WJ-IV test") from 2015 to 2018.  (Mot. at 18.)  The WJ-IV test measures an individual's performance compared to same-aged peers [AR 769] and is considered medical evidence when evaluating childhood disabilities.  <u>See</u> 20 C.F.R. § 416.924a(a)(1)(ii); 20 C.F.R. § 416.926a(e)(ii).  In August 2015 and August 2017, Plaintiff scored "very low" and more than three standard deviations below the mean in nearly all subtests.  (AR 623–24, 768–69.)  In August 2018, Plaintiff's overall performance was in the <0.1 percentile of fourteen-year-old children nationally, as he scored "extremely limited" across most reading, writing, and math domains.  (AR 506.)  Pursuant to the SSA regulations, test scores that are more than three standard deviations below the mean may indicate an extreme limitation in this area of functioning under the child standard.  <u>See</u> 20 C.F.R. § 416.926a(e)(ii)(3).  The ALJ erred by selectively citing to the record and failing to discuss Plaintiff's consistently low academic achievement testing, thus portraying Plaintiff's impairment as less severe than it is.  <u>See</u> <u>Normalya T.</u>, 2023 WL 4109574, at *6 (holding the ALJ erred by "mischaracterize[ing] the evidence on which she relied while ignoring significant probative evidence"); <u>Darren Jeffrey C. v. Kijakazi</u>, No. 3:21-CV-01012-AHG, 2022 WL 4474261, at *16 (S.D. Cal. Sept. 26, 2022) (finding the ALJ improperly cherry-picked statements in the medical record without accounting for the "overall diagnostic picture").

1      Lastly, Plaintiff contends the ALJ's finding of only a moderate limitation in this

2 area of mental functioning is inconsistent with the ALJ's finding of a marked limitation in

3 the functional equivalence domain of acquiring and using information.  (Mot. at 19–20.)

4 Acquiring and using information "involves how well children perceive, think about,

5 remember, and use information in all settings, which include daily activities at home, at

6 school, and in the community."  (AR 33 (citing 20 C.F.R. § 416.926a(g) and SSR 09-3p).)

7 The ALJ's reasoning for finding a *marked* limitation in this functional equivalence domain

8 is nearly verbatim to the reasoning used to find a *moderate* limitation in the functional

9 area of understanding, remembering, or applying information.  (<u>Compare</u> AR 30–31,

10 <u>with</u> AR 34.)  The sole addition to the former is the ALJ's notation that Plaintiff has been

11 in special education his entire student career.  (AR 34.)  Despite the broad overlap

12 between these two areas, the ALJ failed to articulate why he assessed differing levels of

13 limitation.  (<u>Compare</u> AR 30–31, <u>with</u> AR 34.)

14      In summary, we find the ALJ's determination that Plaintiff has a moderate

15 limitation in the functional area of understanding, remembering, or applying

16 information is not supported by substantial evidence.  <u>Revels</u>, 874 F.3d at 654

17 (explaining that substantial evidence is "more than a mere scintilla but less than a

18 preponderance").  First, the ALJ mischaracterized Plaintiff's academic record by isolating

19 his GPA and failing to consider it within the broader context of his special education

20 programming and the amount of support he received.  <u>See</u> <u>Reddick</u>, 157 F.3d at 723;

21 <u>Normalya T.</u>, 2023 WL 4109574, at *6.  Further, the ALJ cherry-picked information by

22 failing to discuss Plaintiff's performance in relation to same-aged peers on the WJ-IV

23 test—objective medical evidence that a reasonable mind would weigh in assessing this

24 functional area.  <u>Darren Jeffrey C.</u>, 2022 WL 4474261, at *16.  Lastly, the ALJ did not

25 sufficiently explain his conflicting determinations of a marked limitation in the

26 functional equivalence domain of acquiring and using information, but only a moderate

27 limitation in the functional area of understanding, remembering, or applying

28 information.  (<u>Compare</u> AR 30–31, <u>with</u> AR 34.)

### b.  Interacting with others

Functional area B2—interacting with others—refers to the abilities "to relate to others age-appropriately at home, at school, and in the community" (child standard) or "to relate to and work with supervisors, co-workers, and the public" (adult standard). See 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.00(E)(2), 112.00(E)(2).[14] [15]  After finding Plaintiff had a moderate limitation in interacting with others, the ALJ explained:

> The claimant reports that his ability to communicate with others is limited [AR 259].  He does not answer the phone or make calls, repeat stories he has heard, tell jokes or riddles accurately, or explain why he did something [AR 259].  He does not have friends his own age or make new friends [AR 261].  However, on May 13, 2019, it was noted the claimant is well liked by students and staff and is very sociable with his friends [AR 994].  He also enjoys going to "Best Buddies" lunch meetings twice a month [AR 994].  This is inconsistent with more severe limitations in interacting with others.

(AR 31.)  Like the previous functional area, Plaintiff argues the ALJ's assessment of a moderate limitation in interacting with others is not supported by substantial evidence because the ALJ mischaracterized evidence and "improperly isolated information from the larger context."  (Mot. at 20–21.)  We agree.

The ALJ's above support for finding a moderate limitation in this area comes from the Strength/Preferences/Interest Section of Plaintiff's IEP dated May 13, 2019 ("2019 IEP").  (AR 994.)  However, later sections of the 2019 IEP provide broader context for Plaintiff's "communication development" and "social emotional/behavioral" characteristics that the ALJ failed to discuss in his analysis.  (See AR 31.)  The 2019 IEP states the following regarding Plaintiff's communication development:

> [Plaintiff] has good communication skills and is very sociable and well liked by his peers and staff.  At the beginning of the school year, he

---

[14] Examples under the child standard include: "Engaging in interactive play; cooperating with others; asking for help when needed; initiating and maintaining friendships; handling conflicts with others."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.00(E)(2).

[15] Examples under the adult standard include: "cooperating with others; asking for help when needed; handling conflicts with others; stating own point of view; initiating or sustaining conversation."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E)(2).

1    was very [quiet] and now that he feels more comfortable he has
2    become out-going and friendly.  However, it seems that he is still a
     young man who is [quiet] and reserved with his words.  [Plaintiff]
3    demonstrates language development that is commensurate with his
4    cognitive abilities.  He does not usually ask questions or volunteer
     answers in the classroom setting unless called upon.

5    (AR 994.)  The 2019 IEP also described Plaintiff's social, emotional, and behavioral

6    characteristics as follows:

7        [Plaintiff] gets along well with peers, and as stated he is well liked.
         He continues to become distracted in class when certain students are
8        there and then becomes unfocused on his assignments.  He likes to
         quietly get their attention in class by smiling and staring at them.  He
9        likes girls and continues to hug and kiss them when no one is looking
10       as was stated last school year.  However, [Plaintiff] is beginning to
         show self-advocacy skills by speaking up politely to express his needs
11       or concerns which shows developing maturity.

12

13   (Id.)  Based on these expanded passages, it appears the ALJ improperly highlighted a few

14   statements from the 2019 IEP, rather than accurately capturing the full context of the

15   document.  See, e.g., Diedrich, 874 F.3d at 642 (finding error where the ALJ "cherry-

16   picked" the absence of certain symptoms); Jones, 2022 WL 4285597, at *1 (finding error

17   where the ALJ omitted important qualifying information); Normalya T., 2023 WL

18   4109574, at *6 (finding error where the ALJ "selectively cited the record").  Further, the

19   ALJ does not explain why he relies on the 2019 IEP rather than the most recent 2021 IEP.

20   (AR 31.)

21       Additionally, Plaintiff asserts his participation in "Best Buddies" is taken out of

22   context because the ALJ did not explain the program's structure (i.e., the school pairs

23   neurotypical peers with students with disabilities and, in this case, "Plaintiff is the

24   student with disabilities").  (Mot. at 20.)  In response, the Commissioner argues that

25   being paired with neurotypical peers does not undermine Plaintiff's interest in

26   participating with others or that he has "normal social behaviors."  (Opp'n at 14.)  The

27   record reveals that all "Best Buddies" activities outside of school hours are "100%

28   chaperoned." (AR 1006.)  While Plaintiff may enjoy being social, the ALJ's analysis still

26

1  fails to contextualize that Plaintiff's participation in this club is a structured, supervised

2  social activity.  See Darren Jeffrey C., 2022 WL 4474261, at *16 (finding error where the

3  ALJ mischaracterized and ignored significant record evidence).

4          Plaintiff further argues his testimony at the September 14, 2021, administrative

5  hearing demonstrated limitations in interacting with others.  (Mot. at 20.)  We agree.

6  First, Plaintiff appeared to become confused when the ALJ asked him how much he was

7  paid for walking his dog.  (AR 56.)  Plaintiff initially said, "two dollars," then changed his

8  answer to "one," and finally said "I don't know."  (Id.)  When asked twice why he takes

9  medication, Plaintiff answered "[f]or dreams" both times.  (AR 57.)  When asked his

10 address, Plaintiff answered simply with the number "1108."  (AR 58.)  Most of Plaintiff's

11 answers at the hearing were a single word.  (See AR 56–58).  When summarizing

12 Plaintiff's testimony in his written decision, the ALJ recited facts about Plaintiff's

13 answers but omitted any discussion of Plaintiff's confusion or how he interacted with

14 the ALJ or counsel.  (AR 39.)  The Commissioner argues that Plaintiff's reliance on "an

15 isolated incident where [Plaintiff] was purportedly confused with the ALJ's questioning"

16 does not undermine the ALJ's reasonable conclusion that Plaintiff enjoys participating in

17 social events and gets along with students and school staff.  (Opp'n at 14.)  However,

18 the opposite is also true: Plaintiff's ability to do certain activities well "does not negate

19 the difficulties the child has in doing other activities."  SSR 09-1p at (III)(B).  Moreover,

20 the SSA does not average the evidence of all the child's activities to determine the rating

21 of limitation within a given domain.  (Id.)  Thus, the ALJ's isolation of certain activities

22 where Plaintiff may have performed adequately does not "offset" Plaintiff's more

23 significant limitations.  SSR 09-1p at (III)(B).

24         In addition to mischaracterizing evidence, the ALJ erred by failing to articulate

25 how the evidence he presented led to his conclusions, thus frustrating meaningful

26 review by the Court.  See, e.g., Cohen v. Kijakazi, No. 2:21-CV-00031-VCF, 2022 WL

27 1136299, at *4 (D. Nev. Apr. 18, 2022) (determining the ALJ's decision was not

28 supported by substantial evidence because "[a]lthough it appears the ALJ considered

1  the appropriate factors, he does not explain how the evidence supports his

2  conclusion"); <u>Santiago v. Barnhart</u>, 278 F. Supp. 2d 1049, 1058 (N.D. Cal. 2003) (finding

3  the ALJ's "failure to articulate some basis for his step-three conclusion necessitate[d]

4  remand").  When evaluating an individual's functioning in interacting with others, the

5  severity of limitation is based on how the individual "relate[s] to others age-

6  appropriately at home, at school, and in the community."   20 C.F.R. Pt. 404, Subpt. P,

7  App. 1 § 112.00(E)(2).

8         Here, the ALJ cited only two statements from Plaintiff's 2019 IEP to support his

9  conclusion that Plaintiff has a moderate limitation in this functional area.  (AR 31.)  The

10  ALJ did not explain why he found the 2019 IEP more credible than other evidence such

11  as the 2020 function report completed by Plaintiff's mother ("Function Report") [AR

12  254–64], which provides more information about how Plaintiff functions at home and in

13  the community, outside of his highly structured educational environment.  Later in his

14  decision, the ALJ noted that Plaintiff reported having two friends, but provided no

15  context for the nature of these friendships and if they occurred outside of the

16  structured school environment.  (AR 40–41 (citing AR 1087).)  Thus, the ALJ's mere

17  recitation of evidence without further explanation falls short of the substantial evidence

18  standard.  <u>See Santiago</u>, 278 F. Supp. 2d at 1058 (finding remand was warranted where

19  the ALJ failed to "sufficiently discuss and evaluate the evidence" before concluding

20  plaintiff did not equal a listed impairment); <u>see also</u> <u>Hahn v. Berryhill</u>, 722 F. App'x 602,

21  604 (9th Cir. 2017) (citing <u>Dodrill v. Shalala</u>, 12 F.3d 915, 918 (9th Cir. 1993)) (noting an

22  ALJ must provide "reasons germane to each witness, supported by substantial evidence,

23  to reject the lay witness statements regarding [a plaintiff's] limitations.")

24         In conclusion, the ALJ's determination that Plaintiff has a moderate limitation in

25  the functional area of interacting with others is not supported by substantial evidence.

26  <u>Revels</u>, 874 F.3d at 654.  The ALJ again did not accurately portray the level of support

27  Plaintiff appears to receive during certain activities and failed to properly contextualize

28  Plaintiff's abilities compared to same-aged peers.  <u>See Reddick</u>, 157 F.3d at 723

1   (reversing where the ALJ mischaracterized evidence to reach the conclusion that

2   plaintiff exaggerated her symptoms).  The absence of any substantive discussion

3   surrounding these important factors, along with the ALJ's isolation of a few favorable

4   facts, frustrates the Court's ability to properly review the ALJ's decision.  See Garrison,

5   759 F.3d at 1017 (finding the ALJ erred by using "a few isolated instances of

6   improvement" as the basis for finding plaintiff was capable of working).

7   ### c.  Adapting or managing oneself

8   Finally, functional area B4—adapting or managing oneself—refers to an

9   individual's "abilities to regulate emotions, control behavior, and maintain well-being"

10  in age-appropriate activities and settings (child standard) or in a work setting (adult

11  standard).  See 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.00(E)(4), 112.00(E)(4).[16][17]  The

12  ALJ provided the following explanation for his finding that Plaintiff has a moderate

13  limitation in this area:

14  > [Plaintiff] cannot cook a meal for himself, do homework, study, take his
    > medication, use public transportation by himself, or avoid accidents [AR
15  > 262].  However, on March 16, 2021, it was reported the claimant takes care
    > of all his daily needs independently and takes care of his bedroom, feeds
16  > the chickens, and helps with yard care [AR 1196].  This is inconsistent with
    > more severe limitations in adapting or managing oneself.
17

18  (AR 31.)

19  Plaintiff contends the ALJ ignored relevant information and improperly isolated

20  favorable facts from the broader context.  (Mot. at 21–22.)  We agree.  The ALJ's

21  examples of Plaintiff's more severe limitations are taken from his mother's Function

22  Report [AR 262], while his examples supporting Plaintiff's independence are taken from

23  the 2021 IEP [AR 1196].  These two sources appear to directly contradict one another, as

24

25  [16] Examples under the child standard include: "Responding to demands; adapting to changes;

26  managing your psychologically based symptoms; distinguishing between acceptable and unacceptable performance in community- or school-related activities."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.00(E)(4).

27  [17] Examples under the adult standard include: "Responding to demands; adapting to changes;

28  managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E)(4).

Plaintiff's inability to cook a meal for himself, use public transportation, or take his medication is directly at odds with Plaintiff "tak[ing] care of all his daily needs independently."  (Compare AR 262, with AR 1196.)  In theory, the 2021 IEP, which was finalized approximately one year after the Function Report, could indicate Plaintiff's independence has improved.  However, the 2019 IEP, completed approximately one year before Function Report, contains nearly identical language to the 2021 IEP.  (Compare AR 874, with AR 1196.)  Once again, the ALJ did not explain why he favored the 2021 IEP over other evidence such as the Function Report.

Additionally, a closer look at the 2021 IEP reveals that the ALJ ignored other relevant information related to Plaintiff's independence.  For example, on the same page that the ALJ referenced, the IEP team noted that Plaintiff struggled with his changing school schedule and required frequent reminders of his daily schedule.  (AR 1196.)  The IEP team also reported that Plaintiff could not find bus routes on the county transit website.  (AR 1205.)  The ALJ did not mention this information in his decision.  Additionally, despite Plaintiff's mother testifying at the administrative hearing that she was in the process of obtaining a limited conservatorship [AR 60], the ALJ did not mention this at all.  (See generally AR 25–43.)

Plaintiff's Individual Program Plan ("IPP") completed by the San Diego Regional Center ("SDRC") on April 4, 2019, seems to provide broader context for Plaintiff's level of independence:

> [Plaintiff] performs his personal care activities independently but, needs reminders.  His parents state that he can complete brushing his teeth, combining [sic] his hair, and shaving all by himself but he needs that constant reminder to finish them.  As well as dressing, he can do it independently but, needs reminders.  His mother states that he likes to constantly wear his favorite clothes and likes to save his dirty clothes back in the closet or drawer.  [Plaintiff] has complete control of his bladder and bowel movements and can go to the bathroom independently . . . His mother reports that's [Plaintiff] will not make basic meals for himself such as a sandwich.

1   (AR 1166.)  The SDRC determined Plaintiff had substantial limitations in the areas of

2   "self-care" and "capacity for independent living."  (AR 759.)  The Commissioner

3   attempts to minimize this evidence by noting the SDRC also described Plaintiff's

4   intellectual disability as "mild."  (Opp'n at 14 (citing AR 759).)  However, there is not

5   enough information to assess how the SDRC's rating scale correlates to the Social

6   Security disability scheme.  See, e.g., Desrosiers, 846 F.2d at 576 (finding the California

7   workers' compensation system measured work capacity "quite differently" than the

8   Social Security disability scheme).

9          Thus, the ALJ's finding that Plaintiff has a moderate limitation in the functional

10   area of adapting and managing oneself is not supported by substantial evidence.

11   Revels, 874 F.3d at 654.  The ALJ improperly isolated favorable facts from the broader

12   context and ignored relevant evidence that was contrary to his conclusion.  See

13   Attmore, 827 F.3d at 877 (finding a lack of substantial evidence where the ALJ relied on

14   isolated improvements); Diedrich, 874 F.3d at 642 (finding the ALJ's improper cherry-

15   picking of evidence was insufficient to show "broader development").

16      **D. Remaining Issues**

17          Plaintiff additionally contends that the ALJ improperly evaluated Plaintiff under

18   child listing 112.11 and adult listing 12.11 for neurodevelopmental disorders [Mot. at

19   12–14]; the ALJ erred in finding that Plaintiff did not functionally equal the severity of

20   the listings [Mot. at 22–24]; and the ALJ erred by crafting an RFC not supported by

21   substantial evidence [Mot. at 24–25].  The ALJ's evaluation of these issues suffers from

22   the same deficiencies described in the discussion above, including cherry-picking

23   isolated examples of adequate abilities, presenting information out-of-context, and

24   failing to meaningfully identify and explain evidence supporting the ALJ's findings.  See

25   supra Part V.A –C.  Because remand is already required, the Court need not analyze the

26   remaining issues.  See, e.g., Hiler v. Astrue, 687 F.3d 1208, 1212 (9th Cir. 2012)

27   (declining to reach other assignments of error by plaintiff where the case was already

28   being remanded); Medina, 2022 WL 3226141, at *13 n. 8 ("Having found remand is

warranted, the Court declines to address Plaintiff's remaining arguments"); <u>Augustine ex rel. Ramirez v. Astrue</u>, 536 F. Supp. 2d 1147, 1153 n. 7 (C.D. Cal. 2008) ("[T]his Court need not address the other claims plaintiff raises, none of which would provide plaintiff with any further relief than granted, and all of which can be addressed on remand").

## VI.  CONCLUSION

The reviewing court may enter a "judgment affirming, modifying, or reversing" the Commissioner's decision.  42 U.S.C. § 405(g).  The reviewing court may also remand the case to the Social Security Administration for further proceedings.  <u>Id.</u>  The reviewing court has discretion in determining whether to remand for further proceedings or award benefits.  <u>See</u> <u>Salvador v. Sullivan</u>, 917 F.2d 13, 15 (9th Cir. 1990); <u>McAllister v. Sullivan</u>, 888 F.2d 599, 603 (9th Cir. 1989).  Remand for further proceedings is warranted where additional administrative proceedings could remedy defects in the decision.  <u>See</u> <u>Kail v. Heckler</u>, 722 F.2d 1496, 1497 (9th Cir. 1984).  Remand for the payment of benefits is appropriate where no useful purpose would be served by further administrative proceedings, where the record has been fully developed, or where remand would unnecessarily delay the receipt of benefits to which the disabled plaintiff is entitled.  <u>See</u> <u>Benecke v. Barnhart</u>, 379 F.3d 587, 593 (9th Cir. 2004); <u>Hoffman v. Heckler</u>, 785 F.2d 1423, 1425 (9th Cir. 1986); <u>Bilby v. Schweiker</u>, 762 F.2d 716, 719 (9th Cir. 1985); <u>Kornock v. Harris</u>, 648 F.2d 525, 527 (9th Cir. 1980).

Here, Plaintiff contends that the Court should reverse the SSA's decision and find Plaintiff disabled.  (Mot. at 26.)  Alternatively, Plaintiff requests the Court remand for further proceedings and that the Commissioner be ordered to properly evaluate all testimony, consider any new evidence proffered, and obtain additional medical or opinion evidence as needed to fully develop the record.  (Mot. at 26–27.)  The Commissioner asks the Court to uphold the SSA's decision, or, if the Court finds reversible error, to remand the case for additional proceedings to remedy any defects.  (Opp'n at 21.)  Because the ALJ ignored relevant opinions and evidence, failed to fully develop the record by ordering further IQ testing, and cherry-picked and

mischaracterized evidence upon which he relied, we find that remanding for further proceedings could remedy these defects.  <u>Leon v. Berryhill</u>, 880 F.3d 1041, 1047 (9th Cir. 2017) (affirming the district court's decision to remand for further proceedings where the ALJ failed to consider all evidence and the record had not been developed thoroughly).  Therefore, the Court **ORDERS** that judgment be entered **REVERSING** the decision of the Commissioner and **REMANDING** the case for proceedings consistent with this Order.

**IT IS SO ORDERED.**

Dated:  January 29, 2024

Honorable Michael S. Berg
United States Magistrate Judge